## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF MISSISSIPPI
## EASTERN DIVISION

**LOUIS HOLLOWAY by and through his**
**Co-General Guardians LARRY HOLLOWAY, Jr.**
**And CARLOS HOLLOWAY**                                          **PLAINTIFF**

**V.**                                          **CIVIL ACTION NO. 2:18-cv-117-KS-MTP**

**MARION COUNTY, MISSISSIPPI,**
**LAURA STOGNER, SHERRY PENDARVIS**
**and JOHN AND JANE DOES 1-100**                                 **DEFENDANTS**

### PLAINTIFF'S MEMORANDUM BRIEF IN SUPPORT OF PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The Plaintiff, Louis Holloway ("Louis") by and through his Co-General Guardians Larry

Holloway, Jr., and Carlos Holloway, by and through counsel of record, hereby files this

Memorandum Brief in Support of Plaintiff's Response to Defendants' Motion for Summary

Judgment in the above- styled cause of action, as follow:

### INTRODUCTION

Louis has been in a vegetative condition since September 25, 2016 due to the actions and

inactions of employees of the Marion Walthall County Regional Correctional Facility

("MWCRCF"). Two of those employees, Defendants Sherry Pendarvis ("Pendarvis") and Laura

Stogner ("Stogner") have filed a motion asking this court to excuse their actions based upon their

claim that they are entitled to qualified immunity. The Court must refuse their request and allow

a jury to decide the factual issues presented by this tragic, but completely preventable, incident.

### PROCEDURAL HISTORY

Plaintiff filed his complaint on July 10, 2018 against Marion County, Pendarvis and

Stogner. After filing their answers, all of the Defendants filed Motions for Judgment on the

Pleadings on August 20, 2018. Pendarvis and Stogner claimed they were entitled to qualified

1

immunity. After the issue was fully briefed, District Court Judge Keith Starrett entered an order

denying Stogner and Pendarvis' motion specially focusing on the following allegations in the

Plaintiff's Amended Complaint:

> The facts alleged in Paragraphs 9 through 17, as opposed to the
> more general facts pled under each count, sufficiently allege that
> both Nurses were aware that a substantial risk of serious harm
> existed. According to the allegations, both Nurses knew (1) that
> Plaintiff had already suffered one seizure; (2) that Plaintiff had
> been placed on medical watch until further notice; (3) Plaintiff had
> been placed on a lower bunk for safety reasons; (4) the Nurses had
> tried to get him more medicine; and (5) Plaintiff had run out of
> seizure medication. In spite of this alleged knowledge, the Nurses
> failed to act. Neither Nurse ordered that Plaintiff be seen by a
> doctor or be sent to a hospital, ensured that he had enough
> medicine, or ensured that he stayed on medical watch and not be
> moved into the general population. ***These allegations adequately
> plead deliberate inference at this stage of the litigation.***

Doc 32. p. 9-10 (emphasis supplied).

Judge Starrett ordered the parties to conduct limited discovery:

> Facts to be addressed during this initial discovery phase ***should
> include the veracity of the allegations outlined in Paragraphs 9-
> 17 of the Amended Complaint, focusing on each Nurses'
> knowledge and actions related to Plaintiff's condition and
> medication and the substantial risk of serious harm to Plaintiff if
> he did not receive those medications***....[1]

Doc 32. p. 11. (footnote original)(emphasis supplied).

The parties engaged in both written discovery and depositions. The Plaintiff deposed

Stogner, Pendarvis, Sheriff Berkley Hall, Jailer Jacob Bennett and Jailer Jonathon May. The

Plaintiff also designated two expert witnesses: Dr. Laura Boylan and Nurse Practitioner Nikesha

G. DuPlessis. The Defendants did not designate any experts nor did they depose Dr. Boylan or

---

[1] The Nurses request that the Court limit the discovery to the issue of whether the Nurses were deliberately indifferent in not sending Plaintiff to the hospital after he took his last Vimpat on September 23, 2016. [24] at p. 12. However, the Court declines to so limit the discovery because other knowledge of the Nurses and their actions during the six days at issue may be relevant as well.

Nurse Practitioner DuPlessis. Further, the Defendants did not file any *Daubert* motions with respect to the Plaintiff's experts' opinions.

## FACTS

The heart of Plaintiff's suit is that the Defendants, Marion County and the other employees of MWCRCF failed and refused to follow the *clearly established* laws, rules, and regulations of MWCRCF, the State of Mississippi, and the United States, which strictly prohibit the Defendants from withholding known needed medication from inmates or pretrial detainees. This is not a suit where an inmate became sick and Defendants failed to realize and treat the inmate. This is a case where the Defendants knew, and admitted that they knew, that the Plaintiff had known, serious medical issues and needed prescription medication to control seizures, and yet they failed and refused to provide it.

MWCRCF is a regional jail which houses both pretrial detainees and convicted felons. At the time of this incident Louis was a pretrial detainee. Louis was booked into MWCRCF at approximately 12:50 a.m. on September 20, 2016. The booking form clearly shows that Louis informed the booking officer that he was taking seizure medications and without those he would have seizures. The booking form also shows that Louis had brain surgery in January 2016. [**Ex. 1 booking form.**] Louis did not have his seizure medicine on him at the time he was arrested. *Id.* Jailer Jacob Bennett was the booking officer that morning. Bennett testified that Louis did not get a health screening due to the fact that there were no medical personnel on site. [**Ex. 2, excerpts of Bennett deposition p. 13.**]

Jailer Johnathan May: Approximately six hours after booking at around 7 a.m., Jailer Jonathan May was making his rounds and found Louis face down on the floor. Louis informed May that he was having seizures. May used a wheel chair to transport Louis to medical where

they waited for the nurse. May testified that he told Pendarvis that Louis said he was having seizures. [**Ex. 3 excerpts of May's deposition p. 14-17.**] Even though MWCRCF has surveillance cameras set up in the area where Louis was held, May did not review the film or talk to any inmates to confirm that Louis was having seizures. *Id.* @ p. 17-18.

<u>Nurse Sherry Pendarvis:</u> Pendarvis has been a nurse at MWCRCF since 2008. [**Ex. 4, excerpts of Pendarvis' deposition p. 11.**] Pendarvis testified that all inmates get a medical screening at booking. She stated that if there is a medical problem, she discusses the issue with the person including the medications they are taking and their doctor's name. The nurses will then obtain further information from the doctor via a medical release, including medications and pending appointments. Pendarvis agreed that it was important to get the patients' medical records. *Id.* @ p. 17-20. Inmates have a right to receive their medicine while at MWCRCF, in fact the standard of care is to follow the physician's orders with regards to dispensing medicine. *Id.* @ p. 20-21. Despite acknowledging the importance of obtaining a patient's medical records, Pendarvis did not obtain Louis' medical records until September 23, 2016, three days after booking. Pendarvis claimed she had already left the facility for the weekend and did not have a chance to review the medical records. However, while being deposed, Pendarvis was shown where the medical records were received on September 23, 2016 at 1:08 p.m. while she was still on duty at MWCRCF. Pendarvis was forced to admit she received but did not review the records. *Id.* @ p. 120-123.

According to Pendarvis, she knew Louis from previous incarcerations. She was aware he had epilepsy which caused seizures. His family would typically bring his medications to MWCRCF. *Id.* @ p. 24-25. Pendarvis was aware that seizures are a serious medical condition which could be triggered by numerous things including cessation of medication. *Id.* @ p. 26.

Pendarvis stated that Louis had to be taken to the hospital after he suffered a seizure in one of his previous incarcerations. *Id.* @ p. 142. Pendarvis testified that as a nurse she cannot diagnosis a patient, only a doctor or nurse practitioner can do this. *Id.* @ p. 34.

The medical staff at MWCRCF typically works from 8 a.m. until 5 p.m. and after 5 p.m. the jailers were required to check on all inmates who are under "medical watch". MWCRCF has a nurse practitioner who comes to MWCRCF in person every Tuesday and is otherwise available by phone. *Id.* @ p. 27-33. Pendarvis and the other MWCRCF nurse, Stogner, rotate weekends. Whomever is on duty over the weekend will come into MWCRCF in the morning and afternoon for pill call. Pendarvis admitted that even though May told her that Louis had a seizure, she did not question Louis about this nor did she take his vital signs. Pendarvis stated she could not determine whether Louis had a seizure without actually witnessing it or questioning the patient, which she did not do. *Id.* @ p. 98-99. If Louis had a "witnessed seizure" he would have been taken to the emergency room. *Id.* @ p. 65-66. Pendarvis knew firsthand of Louis' history of seizures and recent brain surgery, yet even after having being told by May that Louis had experienced another seizure, Pendarvis did not consult with a doctor or the nurse practitioner but instead, on her own, chose not to send Louis to the emergency room.

Pendarvis was shown Louis' Medication Administration Record ("MAR") which identified that his Neurologist, Dr. Mishra, prescribed three (3) anti-seizure medications. Pendarvis acknowledged the prescription is the doctor's orders and nurses are required to administer the medications as directed. If for any reason the medicine cannot be dispensed as directed, the nurses are required to call the doctor and have it ordered. Pendarvis testified if the doctor does not have the medication then she would call the pharmacy with whom MWCRCF has a contract to order it. If the pharmacy was out of stock she would rely on the inmates' family

to bring the medicine. If the family did not have it Pendarvis testified "I don't know what to do". *Id.* @ p. 38-41.

Louis' family brought his three (3) prescriptions to MWCRCF on September 20, 2016 in the morning and they were given to Louis. Louis takes two (2) Vimpat pills daily but only had eight (8) pills left. Louis could not afford any more of the Vimpat and neither could his family. Marion County has a contract with Shepherd's Pharmacy to provide medications. Pendarvis called Shepherd's Pharmacy on September 22, 2016 but they did not have Vimpat in stock. Pendarvis did not call any other pharmacy nor did she call Louis' doctor or the MWCRCF nurse practitioner. Even though Pendarvis knew that a nurse cannot stop administering a drug, Louis received his last Vimpat on September 23, 2016 at 5:00 p.m. Contrary to the argument made to this court in their qualified immunity motion, ***Pendarvis admitted that she knew that Louis could have a seizure if he stopped taking Vimpat.*** *Id.* @ p. 72-73 and [**Ex. 5**, **Vimpat handout**.] MWCRCF policies and procedures required Pendarvis to follow medical orders and if a patient runs out of medicine, nurses are required to contact the MWCRCF nurse practitioner. [**Ex. 4. p. 87-88.**] Pendarvis stated she did not contact the nurse practitioner because she thought the family would bring the medicine even though she knew on September 23, 2016 that the family could not afford the medicine. Pendarvis agreed that she should have referred Louis out to a provider. *Id.* @ p. 76.

When Louis' prescription bottles were brought to MWCRCF it showed they were filled at the Walmart in Pass Christian, Mississippi. *Id.* @ p. 114. When asked if anyone ever called that pharmacy to see if they could refill Louis' Vimpat Pendarvis stated that she ***believed*** she called the pharmacy but failed to document it in her notes. Regardless, Pendarvis testified she never asked them to refill Louis' Vimpat. *Id.* @ 115-116.

6

On September 24, 2016 at 11:28 p.m. the Plaintiff was moved out of the medical cell in order to make room for another inmate. Pendarvis was off duty but MWCRCF staff called her, and Pendarvis advised MWCRCF staff to move Louis to a lock down cell in general population. It is important to note that there was no medical check performed on Louis prior to the move nor was a doctor or nurse practitioner consulted. *Id. @* p. 133-135. Louis had not had his Vimpat medication all day. *Id. @* p. 134.

Nurse Laura Stogner: Stogner has worked at MWCRCF since April 2003 and she too was familiar with Louis and his serious medical condition, including his most recent brain surgery. [**Ex. 6**, **excerpts of Stogner's deposition p. 12, 31-32.**] In fact, Stogner stated that MWCRCF had medical records detailing Louis' condition going back to 1999. *Id. @* p. 32. Stogner also acknowledged that nurses could not diagnose patients, only doctors and nurse practitioners did. *Id. @* p. 18. Stogner testified that prescriptions are treated like doctor's orders and nurses had to follow them. It would be a breach of the standard of care to not follow them. If the nurses cannot administer a patient's medicine they were required to either contact the patient's doctor or MWCRCF nurse practitioner. *Id. @* p. 25-26. Despite acknowledging the importance of obtaining Louis's medical records detailing his January 2016 brain surgery, the nurses failed to obtain these records until September 23, 2016. Stogner does not even recall looking at them. *Id. @* p. 54-56. Although Louis' family was going to try to get Vimpat for Louis, it was not their responsibility to do so. Rather MWCRCF was required to provide them. *Id. @* p. 60.

Louis ran out of his Vimpat on September 23, 2016 and Stogner acknowledged that stopping Vimpat can trigger a seizure. Stogner was show a copy of the Vimpat handout which clearly advises this but Stogner was already aware that this was dangerous. *Id. @* p. 51-52. Stogner acknowledged that neither nurse either called Louis' doctor or the nurse practitioner

when they ran out of Vimpat. Stogner claimed that she did not know how to obtain Vimpat in an emergency situation but admitted that **neither nurse made any effort to do anything more than contact Shepherd's Pharmacy**. *Id.* @ p. 70-71. Stogner testified that September 23, 2016 was a Friday and she was on duty that weekend. Stogner would come in the morning and do pill call, then leave the facility and come back in the afternoon. *Id.* @ p. 71. Stogner testified that it would be better for someone with a serious medical condition to be in a hospital setting "but when you break the law you have to go to jail". *Id.* @ p. 79.

Stogner came in on Sunday morning, September 25, 2016, and that is when Louis was found unresponsive. The code blue was called at 8:36 a.m. *Id.* @ p. 87. It does not appear that the jailers were checking on him every 28-32 minutes as required. *Id.* @ p. 84-86.

Sheriff Berkley Hall:  Sheriff Berkley Hall has been in office for 12 years and is the policymaker of MWCRCF. [**Ex. 7, excerpts of Sheriff Hall's deposition, p. 6-7.**] Sheriff Hall considers Louis' condition to be a serious medical condition. *Id.* @ p. 19.

Sheriff Hall acknowledged that the area where Louis had his first seizure was under video surveillance. MWCRCF typically retained the video for two weeks, although he could not personally remember receiving the letter. Although he could not remember receiving the letter, Sheriff Hall acknowledged that a letter of preservation was sent to him and the Marion County Chancery Clerk on September 30, 2016, five days after Louis' last seizure. However, the video surveillance was not preserved. *Id.* @ p. 8-12. Sheriff Hall had no valid explanation for why the video was not preserved and his understanding was the county is "liable" if they do not preserve the video. *Id.* @ p. 9.

With regards to Louis' medication, Sheriff Hall stated that it was a violation of policy to not obtain Louis' prescription and he had a "problem with that.". *Id.* @ p. 20, 25. The County has a duty to provide an inmate his medication if he cannot afford it. *Id.* @ p. 24-25.

### EXPERT TESTIMONY

<u>Dr. Laura Boylan:</u> The Plaintiff designated Dr. Laura Boylan ("Dr. Boylan") as an expert witness in the field of psychiatry and neurology. Dr. Boylan's expert opinion and CV are attached as [**Ex. 8.**] Dr. Boylan has extensive clinical and teaching experience in the evaluation and treatment of those with known or suspected cognitive, behavioral and emotional problems related to specific neurological conditions. Such conditions commonly include anoxic brain injury and seizures (Louis has both), traumatic brain injury, the dementias, movement disorders, and congenital and developmental neurological problems. Dr. Boylan directed clinics in Behavioral Neurology and Neuropsychiatry at Bellevue Hospital and at the Manhattan VA hospital from 2000-2008. The evaluation and treatment of neurologic emergencies involving seizures and/or anoxic brain injury constitutes a substantial portion of inpatient neurology. As Dr. Boylan indicated in her expert report, she saw at least five patients with anoxic brain injury and/or seizures the week prior to writing her report. As a resident she would sometimes take care of five such patients in one night.

According to Dr. Boylan, Sudden deaths in epilepsy patients ***usually occurs in bed, at night and are more often seen in epilepsy patients who are not monitored or supervised overnight***. Being found prone or having trouble with breathing or the heart after a seizure are also associated with sudden cardiopulmonary arrest in epilepsy (Devinsky 2011).

Dr. Boylan opined that Louis had a seizure or seizures which caused a cardiac arrest on September 25, 2018. While heartbeat and circulation were successfully restored following

resuscitation efforts, Louis' brain was severely damaged by lack of oxygen. Louis' cardiac arrest was most likely caused by a seizure, which was precipitated by recent cessation of anti-epileptic medication with inadequate repletion and alcohol withdrawal, physiological and psychological stressors, which are established risk factors for cardiac events (Jeong 2018, Boylan 2018), were most probably also contributory to Louis' cardiac arrest. *Id* @ p.10. Louis was at extremely high risk to have a seizure under provocative conditions or, the absence or reduction of his anti-seizure medications. Provocative factors in Louis' case include untreated alcohol and anti-epileptic withdrawal as well as the psychological and physiological stress of incarceration, particularly to a "lock down" setting. Unmonitored sleeping is a risk factor for cardiorespiratory arrests in epilepsy and Mr. Holloway (Louis) was apparently unmonitored overnight before being "found down" ***Simple positioning maneuvers can reduce the risk of serious injury, aspiration and asphyxiation with an acute seizure.*** *Id.* @ p.11.

Nurse Practitioner Nikesha Guice DuPlessis[2]: The Plaintiff's other expert witness, Nurse Practitioner DuPlessis ("N.P. DuPlessis"), was extremely critical of the nursing care. A copy of N.P. DuPlessis' opinion and CV is attached as [**Ex. 9.**] N.P. DuPlessis noted that "[t]he Epilepsy Foundation commonly reported seizure triggers include the following: missing doses of seizure medications, alcohol withdrawal, drug abuse, photosensitivity, and over the counter medications…Missing seizure medications is the most common cause of epileptic seizures. Missing seizure medication is unsafe and can cause longer seizures, clusters of seizures, or status epilepticus. Status epilepticus is a medical emergency and "occurs when a seizure lasts too long or when seizures occur close together and the person doesn't recover between seizures." *Id* @ p. 8. When Nurse Pendarvis learned that the pharmacy was out of Vimpat on September 22, 2016 Nurse Pendarvis had two days before the medicine ran out to have Vimpat shipped from another

---

[2] NP DuPlessis recently married. Her last name was "Guice" when she wrote her initial report.

pharmacy or Mr. Holloway (Louis) should have been referred and given access to clinical services in another appropriate setting. ***Vimpat is a medication that should not be abruptly stopped or changed***. *Id.* @ p. 10

Blame the victim: In their motion for summary judgment, the Defendants point to Louis' alleged comments in their medical notes that Louis had not had any seizures since the first one and that he had his medicine in him and felt good and exhibited no signs of seizure activity. Doc. 64, p. 7-8. However, as N.P. DuPlessis points out in her opinion, Louis "could have seized more than reported and have no recollection of the seizures. Not every epileptic has a trigger or can recall a seizure." [**Ex. 9, p. 11.**]

Stogner and Pendarvis even attempted to shift the blame to Louis claiming that he had his medication in him and felt good and never informed them that he may have a seizure if he missed a dose of Vimpat while continuing to take his other two seizure medications. Doc. 64, p. 7-8. It is quite possible, if not probable, that Louis simply did not understand the nature of "polypharmacy"[3] and what could happen if one of his medications was abruptly stopped while continuing the other two; Louis had no medical training. Louis trusted the medical judgment of Pendarvis and Stogner. It is unbelievable that a medical professional would blame a patient for not understanding the consequences of not taking necessary medication. Their statements suggest that the untrained patient was expected to know more and better than the medical professionals. And of course Louis "felt good" at the time because he was taking his seizure medication. This misguided attempt to blame Louis for his current permanent vegetative state when he was in the custody and care of the Defendant Nurses Stogner and Pendarvis, is incredulous.

As N.P. DuPlessis noted, Pendarvis was responsible for clinical decisions and she exercised poor judgment in the following: (1) did not consult 24-hour emergency on call MCCF physician

---

[3] Taking more than one medication at the same time.

on Louis' admission (2) delayed MCCF physician evaluation for one week (3) did not implement a plan for Louis to receive Vimpat in a timely manner (4) transferred a high-risk health detainee to general population and (5) did not medically monitor Louis when placed in general population. As a consequence of Nurse Pendarvis' poor clinical decisions, Louis is currently in a vegetative state. *Id.* @ p. 12-13.

## LEGAL PRECEDENT AND ANALYSIS

### I.     Summary Judgment Standard

The Defendants' Motion for Summary Judgment Premised on Qualified Immunity should be denied on the basis of law and due to the numerous genuine issues of fact.  The Defendants accurately set forth the appropriate standards of review but omitted the requirement that when presented with a summary judgment motion, the court is to "examine each issue in the light most favorable to the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. 242 (1986).. Doc 63, p. 10-11.

### II.     Qualified Immunity Analysis

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *McClendon v. City of Columbia*, 305 F.3d 314, 322 (5th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The Fifth Circuit has held that "[a] jail official violates a pretrial detainee's constitutional right to be secure in his basic human needs only when the official had 'subjective knowledge of a substantial risk of serious harm' to the detainee and responded to that risk with deliberate indifference." *Estate of Henson v. Wichita Cty., Tex*, 795 F.3d 456, 462 (quoting *Hare v. City of Corinth, Miss.,* 74 F.3d 633, 650 5th Cir. 1996). In other

words, "the state official must know of and disregard an excessive risk to inmate health or safety." *Id.* (citation omitted). For such a claim, "[t]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* (quotation omitted).

### A.  Subjective Awareness of Serious Medical Condition

Stogner and Pendarvis, or more precisely their attorneys, contend that the nurses were not aware that missing two (2) days of Vimpat could trigger a seizure. Doc. 64, p. 14. This statement is in direct conflict with the nurses' deposition testimony which clearly demonstrated that each nurse were subjectively aware of a substantial risk of serious harm if Louis stopped taking his seizure medication.

Each nurse testified that many things can trigger Louis' seizures **including cessation of medication, especially Vimpat.** Both nurses were aware that Louis had brain surgery in January 2016 to help with his seizures as it was documented on his booking form. [**Ex. 4, 57-58**] [**Ex. 6 p. 34.**] Pendarvis and Stogner testified that they knew Louis had seizures from his previous incarcerations in MWCRCF.  Stogner testified that even the guards knew Louis and called us when he came to MWCRCF so they made sure to go check on him. [**Ex. 6, p. 34.**] Each nurse testified that Louis' seizures were a "serious medical condition". [**Ex. 4. p. 26, Ex. 6. p. 31-32.**] Stogner testified that MWCRCF had medical records on Louis since 1999 documenting his history of seizures. [**Ex. 6 p. 32.**]

### B.  Constitutional right to medical treatment/Objective Unreasonableness

Pretrial detainees, like Louis, have a constitutional right to medical treatment for "serious medical needs".  Louis' epilepsy/seizure condition is considered a serious medical need. "A serious medical need is one for which treatment has been recommended or for which the need is

so apparent that even laymen would recognize that care is required." *Kitchen v. Dallas County,* 759 F.3d 468 (5ᵗʰ Cir. 2014). The Defendant nurses, Sheriff, and jailers testified that it was common to house inmates who had seizures at MWCRCF and it was common sense that they would experience seizures without seizure medication. Seizures are a "serious medical condition". *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012)("medical conditions much less serious than seizures have satisfied the [serious medical condition] standard"); *Quatroy v. Jefferson Parish Sheriff's Office*, 2009 WL 1380196, *10 (E.D.La. May 14, 2009) ("nontreatment of seizures" is indifferent to serious medical need).

Stogner and Pendarvis acted "objectively unreasonable" to Louis' serious medical needs. "Wanton disregard for any serious medical needs" and "staff inaction" can strip an official of qualified immunity. *Estate of Henson v. Krajca*, 440 Fed. Appx. 341 (5ᵗʰ Cir. 2011). If every reasonable officer would have understood that the alleged conduct violated a clearly established Constitutional violation, then qualified immunity is to be denied. *Brauner v. Coody*, 793 F.3d 493 (5ᵗʰ Cir. 2015). Denying "timely medical care" is a constitutional violation. *Hawkins v. Montague County*, (N.D. TX 2010). The "[Plaintiffs] must show that some specific individual was aware of serious need of insulin and that the same individual knowingly denied him the insulin." *Benford v. Walker*, (S.D. TX 2011). The record clearly shows that Stogner and Pendarvis were both aware of Louis' seizures and failed to provide him one of his seizure medications.

Stogner and Pendarvis testified that as nurses, they were not allowed to diagnosis a condition. Only a doctor or nurse practitioner could do this. Yet when Louis was found face down in MWCRCF on September 20, 2016 and informed officers that he was having seizures, the nurses failed to call the nurse practitioner or doctor to see what to do for Louis. When Louis

14

ran out of his Vimpat medication neither nurse called a doctor or nurse practitioner to see what to do. Instead, they simply ignored Louis' physician's orders. The Defendants failed to cite any cases wherein a nurse was given qualified immunity when they failed to give a patient medicine for a ***serious medical condition.*** The cases cited by the Defendants regarding inmates missing medication dealt with non-life sustaining medication: *Stockwell v. Kanan*, 442 F.App'x 911 (5th Cir. 2011)(pro se inmate filed claim after he did not receive psychological and pain medicine); *Smith v. Townsend* 2016 WL 918980 (inmate did not always receive his psychological medicine for three weeks). Both cases are easily distinguished from the case before the court since neither involved a serious medical condition like Louis unquestionably had.

Judge Hal Ozerden addressed a denial of seizure medications in *Lee v. Jackson County*, 2017 U.S. Dist. LEXIS 295 (S.D. Miss. 2017). The facts in that case showed that John Lee was arrested for felony shoplifting and booked into the Jackson County Adult Detention Center ("ADC"). Lee required heart and seizure medications. The policy of the ADC was for the inmates to send a written request to the medical staff and sign a release of information ("ROI") so that the ADC could retrieve medical records. Lee made a written request on January 6, 2013 and Nurse Jona Crowley, the jail nurse, received it on January 7, 2013. Nurse Crowley, unlike the nurses in the present case, was not subjectively aware that Lee actually suffered from epilepsy. Nurse Crowley wrote back to Lee and asked him where his medications were so that they could be brought to the jail and also asked Lee to sign a ROI. Nurse Crowley said that a jail staff member called Lee's sister and asked her to bring his medication to the jail but no one was willing to do so. Nurse Crowley never reviewed Lee's medical history which would show that Lee had been incarcerated at the ADC before and required both heart and seizure medications.

Lee wrote another request seeking to be placed on his medications on January 8, 2013. A captain responded that Lee needed to have his medications brought to the jail. It was unclear whether Nurse Crowley saw this written request. Lee sent yet another request on February 22, 2013 and the response was written by another nurse, not Nurse Crowley. Lee did not receive his seizure medications while in jail and ultimately died on February 24, 2013. ***Nurse Crowley never saw Lee during his incarceration.***

Nurse Crowley was sued under 42 U.S.C. §1983 and argued she was entitled to qualified immunity. Judge Ozerden denied the motion finding that Nurse Crowley received a request from Lee that he needed seizure and heart medication; failed to obtain the Lee's medical records to check his history; failed to have the jail doctor examine the Lee; and failed to tell the jail doctor that Lee had requested both seizure and heart medications. Even though Nurse Crowley had no face to face contact with Lee, Judge Ozerden held that "a rational jury could conclude that Crowley was aware of facts from which the inference could be drawn that a substantial risk of harm to Mr. Lee existed and that Crowley actually drew the inference." *Id.* @ p. 29.

There is absolutely no question that Pendarvis and Stogner were subjectively aware of Louis' serious medical condition, i.e. seizures. Despite this subjective knowledge they failed to give Louis one of his prescribed seizure medications, failed to review Louis' medical records detailing his latest brain surgery despite having received this information on September 23, 2016, failed to contact Louis' doctor or MWCRCF nurse practitioner, failed to reach out to another pharmacy to see if they had Vimpat in stock, and as a result Louis suffered a seizure from which he has not recovered. The facts of this case are much stronger than *Lee, supra.*

The 5th Circuit has found deliberate indifference where jail nurses did not follow specific mandatory orders and doctors' instructions despite their actual knowledge of the seriousness of

an inmate's condition. See *Lawson v. Dallas County* 286 F.3d 257, 263 (5th Cir. 2002). Here, the testimony is undisputed that both Nurse Defendants failed to follow doctors' orders when they failed to give Louis the Vimpat despite and both had actual knowledge of his serious medical condition and even seizures during prior incarcerations.

In *Hudson v. McHugh*, 148 F.3d 859 (7th Cir. 1998) Hudson, an inmate, went without his seizure medications for eleven (11) days and suffered a seizure. He filed a *pro se* complaint against various individuals including the jail nurse and jailers. He alleged that the jail intake officers and  nurse (1) knew about his epilepsy--because he told them during the intake interview and throughout the days before his seizure--(2) knew that he was not getting Dilantin-- again, because he told them--and (3) still did nothing about it in the face of his repeated requests. While the district court found that this only stated a claim of negligence, the 7th Circuit Court of Appeals disagreed holding "this is the prototypical case of deliberate indifference, an inmate with a potentially serious problem repeatedly requesting medical aid, receiving none, and then suffering a serious injury." *See Antonelli v. Sheahan,* 81 F.3d 1422, 1432 (7th Cir. 1996). As in Louis' case, the nurses at the jail knew the basic facts giving rise to the inference that he had a serious medical need--they knew he had epilepsy, they knew he did not have his medicine and they knew he wasn't getting it--and with knowledge of these basic facts pleaded, drawing the inference of a serious medical need is a question of fact. *Farmer v. Brennan* 511 U.S. 825, 842-843 (1994). And, also according to the allegation, they did nothing about it, thus satisfying the response element.

In ruling against the Defendant Nurse's *Motion for Judgment on the Pleadings* in the present case, Judge Starrett was clear that he wanted the parties to address the **veracity of the Plaintiff's claims as to 1) whether the nurses were aware of Louis' condition and 2) the effect**

*of Louis not receiving his medication*. It is without dispute that Stogner and Pendarvis both freely admitted to being subjectively aware of Louis' serious medical condition and they were both aware the stopping Vimpat could trigger a seizure. Despite this knowledge, the nurses ran out of Vimpat and failed to obtain more despite having sufficient time to do so. The nurses stopped giving Louis Vimpat without consulting Louis' doctor or MWCRCF nurse practitioner despite that being the policy of MWCRCF. There was absolutely no excuse given by the nurses other than they could not obtain the Vimpat because the pharmacy was out or his family said they would bring the medicine. At a minimum, the nurses should have sent Louis to the hospital to be observed. Perhaps Stogner's testimony on this point illuminates how deliberately indifferent the nurses were. Although Stogner agreed it was better for a person with a serious medical condition to be in the hospital *"when you break the law you have to go to jail*…" [**Ex. 6, p. 79.**] The Defendant Nurses are not entitled to qualified immunity.

### ADVERSE INFERENCE

Throughout Pendarvis' deposition, she testified that the reason she did not send Louis to the emergency room after he suffered a seizure on September 20, 2016 was because neither she nor the officers witnessed it. To the extent the Defendants cast doubt on Louis' first seizure in their rebuttal, the Plaintiff submits that Marion County's failure to preserve the video surveillance which would have conclusively shown Louis having a seizure must be adversely construed against the Defendants.

The Plaintiff's attorneys sent a "letter of preservation" to Marion County's sheriff and chancery court clerk asking them to preserve any and all surveillance video. The letter was sent five (5) days after Louis was found unresponsive. A copy of the letter is attached as [**Ex. 10**.] A copy of the letter acknowledging receipt is attached as [**Ex. 11**.] According to testimony, the

surveillance video would have shown Louis when he suffered his first seizure on September 20, 2016. Sheriff Hall admitted that the video should have been preserved but could not provide a valid reason as to why it was not. Sheriff Hall testified that MWCRCF "erases" all videos after two weeks. The Plaintiff's letter of preservation was mailed five days after so the video should have been preserved.

The Fifth Circuit permits an adverse inference against the destroyer of evidence only upon a showing of 'bad faith' or 'bad conduct.'" *Id.* "Mere negligence is not enough, for it does not sustain an inference of consciousness of a weak case." *Vick v. Texas Employment Comm'n*, 514 F.2d 734, 737 (5th Cir. 1975) (quoting McCormick on Evidence). When bad faith or bad conduct has been shown, a spoliation instruction allows but does not require the jury to draw an adverse inference against a party. *BCE Emergis Corp. v. Cmty. Health Solutions of Am., Inc.*, 148 F. App'x 204, 219 (5th Cir. 2005) (unpublished). District courts may permit the parties to put on evidence about the alleged spoliation and let the jury "punish [parties] accordingly." *Id.*; *see United States v. Wise*, 221 F.3d 140, 156 (5th Cir. 2000) ("A district court has discretion to admit evidence of spoliation and to instruct the jury on adverse inferences."). *Wallace v. Ford Motor Co.*, 2013 U.S. Dist. LEXIS 91164, *15-16, 2013 WL 3288455 (S.D. Miss. June 28, 2013). "The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Zubulake v. UBS Warburg, LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003) (quoting *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001)) (additional citations omitted).

If a court concludes an adverse inference is warranted, then it can deny summary judgment because the adverse inference provides a genuine issue of material fact for a jury to

consider. *De Los Santos v. Kroger Tex., LP,* 2015 U.S. Dist. LEXIS 71913, *9 n. 2 citing to

*Molzberger v. HWCC-Tunica, Inc.,* No. Civ. A. 2:02-CV-317-JAD, 2005 U.S. Dist. LEXIS

49363, 2005 WL 1660451, at *3 (N.D. Miss. July 8, 2005) ("Since the plaintiff has the burden of

proof, and *intended to meet her burden by relying on an adverse inference* arising from

spoliation of these records, it was incumbent upon the plaintiff to develop at least some proof of

the defendant's intentional and bad faith destruction of the records.") (emphasis added).

A showing of intentional conduct and bad faith should not put too heavy a burden upon a

litigant seeking an adverse inference instruction. As explained by the Mississippi Supreme

Court:

> Requiring an innocent litigant to prove fraudulent intent on the part
> of the spoliator would result in placing too onerous a burden on the
> aggrieved party. To hold otherwise would encourage parties with
> weak cases to 'inadvertently' lose particularly damning evidence
> and then manufacture "innocent" explanations for the loss. In this
> way, the spoliator could essentially destroy evidence and then
> require the innocent party to prove fraudulent intent before the
> destruction of the evidence could be used against it.

*Thomas v. Isle of Capri Casino*, 781 So. 2d 125, 133 (Miss. 2001).

On that same note, a court cannot simply take spoliators at their word that there was

nothing of consequence on a piece of destroyed evidence or that they negligently lose evidence.

Doing so would create a rule that evidence be viewed in the light most favorable to the spoliator.

The law does not require this. Further, doing so would give litigants an incentive to destroy

evidence.

In the case before the Court, Marion County received the preservation letter within 5 days

of the incident. The sheriff testified that tapes are kept for 14 days (two weeks) and could give no

explanation for why the video was not available. Marion County had a duty to preserve this

evidence. The Plaintiff must be given the benefit that the video, inexplicably destroyed prior to

standard procedure, would have conclusively shown that he suffered a seizure on September 20, 2016 and therefore should have been taken to the hospital. There is absolutely no excuse for Marion County's actions and the court should not condone it.

## CONCLUSION

The Defendants Stogner and Pendarvis are not entitled to qualified immunity. Each nurse was subjectively aware of what could happen if Louis did not receive his seizure medication, yet they simply allowed him to run out of his Vimpat. This is "text book" deliberate indifference. Further, the Defendants' request for a *Schultea* Reply to meet the heightened pleading standard should be denied. In *Hollins v. City of Columbia*, et.al. 2:19-cv-28-KS-MTP, Doc. #22, Judge Starrett ruled that the "heightened pleading standard" does not apply to civil rights cases following 5th Circuit precedent. In addition, the Court has already determined that the Plaintiff's *First Amended Complaint* properly plead valid claims against each defendant.

RESPECTFULLY SUBMITTED, THIS the 28th day of October, 2019.

BY:   */s/ Charles R. Mullins*
      CHARLES R. MULLINS

OF COUNSEL:

CHARLES R. MULLINS (MB# 9821)
COXWELL & ASSOCIATES, PLLC
Post Office Box 1337
Jackson, Mississippi 39215-1337
Telephone: (601) 948-1600
Facsimile:  (601) 948-7097
chuckm@coxwelllaw.com

<u>CERTIFICATE OF SERVICE</u>

I, Charles R. Mullins, attorney of record for the Plaintiff in the above-styled and referenced matter, do hereby certify that I have this date electronically filed the above and foregoing, *Plaintiff's Memorandum Brief in Support of Plaintiff's Response to Defendants' Motion for Summary Judgment* with the Clerk of the Court using the ECF system, which sent notification of such filing to all known counsel of record.

THIS, the 28th day of October, 2019.

/s/ *Charles R. Mullins*
CHARLES R. MULLINS