**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION**

**LOUIS HOLLOWAY, by and through his
Co-General Guardians, LARRY HOLLOWAY, JR.
and CARLOS HOLLOWAY**                       **PLAINTIFF**

**V.**                     **CIVIL ACTION NO. 2:18-cv-00117-KS-MTP**

**MARION COUNTY, MISSISSIPPI,
LAURA STOGNER, SHERRY PENDARVIS,
And JOHN AND JANE DOES 1-100**                       **DEFENDANTS**

## MEMORANDUM OPINION AND ORDER

This cause came before the Court on the Motion for Summary Judgment Based on Qualified Immunity filed by Defendants Laura Stogner and Sherry Pendarvis. [63]. These Defendants filed a supporting memorandum [64], Plaintiff filed a response [66, 67], and Defendants have replied [69]. Having considered the submissions of the parties, the record in the matter, and the relevant legal authority, and otherwise being fully advised in the premises, the Court finds that because the Defendants' actions were not objectively unreasonable, the motion should be granted.

**I. BACKGROUND**

    **A. Procedural History**

On July 10, 2018 Plaintiff filed an Amended Complaint. [2]. Defendants answered. [10]. Defendants Pendarvis and Stogner (the "Nurses") previously filed a Motion for Judgment on the Pleadings ("MJOP") [13], challenging the adequacy of the pleadings. In the Order denying the MJOP, the Court allowed limited discovery to address the veracity of the allegations (knowledge of and actions relating to Louis Holloway's condition and medication and the risk

of harm to Mr. Holloway) to allow for an eventual substantive determination as to whether the Nurses are entitled to qualified immunity. *See* [32] at pp. 10-11. The Order also allowed for discovery as to the Nurses' employment status. *Id.* at p. 10. The Nurses have filed a Motion for Summary Judgment as to Qualified Immunity after having conducted such limited discovery and now seek to have the Court determine this substantive issue.

**B. Factual Background Based on Summary Judgment Evidence**

This case arises out of the unfortunate death of Louis Holloway, who was detained in the Marion-Walthall County Regional Correctional Facility ("MWCRCF") in September 2016. The evidence submitted thus far, for summary judgment purposes, shows as follows:

At the time of the incident which gives rise to this Complaint, Louis Holloway was a 35-year old pretrial detainee incarcerated at the MWCRCF.[1] Nurses Stogner and Pendarvis were hired by Marion County to provide medical treatment to inmates at the MWCRCF and at all times relevant were acting within the course and scope of their employment. [63-4] at 12:7-13; [63-5] at 13:24-14:12.[2]

On September 20, 2016 at 12:54 a.m. Holloway was booked into the MWCRCF after being arrested on a second DUI offense. [2] at ¶ 9. He had been to the facility several times in the past and the Nurses were quite familiar with him. [63-4] 24:17-25:9; [63-5] 30:9-20. During booking, detainees undergo a medical screening. [63-4] 17:15-19. On his intake form, it shows that Holloway advised the booking officer that he had recently been hospitalized for brain

---

[1] At the time this lawsuit was filed, Plaintiff Louis Holloway was in a vegetative state. *See* [2] at ¶ 4. However, shortly after briefing on the Motion for Summary Judgment was completed, on November 16, 2019, Louis Holloway passed away. Larry Holloway, Jr. and Carlos Holloway, heirs and beneficiaries of Louis Holloway, have since been substituted as Plaintiffs. *See* [70, 71].

[2] In the Motion for Summary Judgment and the response, none of the parties appear to take issue with the fact that the Nurses were employed by Marion County to work in the MWCRCF.

surgery and that he was prescribed tegratol, phenabarbatol [sic], and norco 10. [63-3].[3] Holloway also advised that "without medication he will have seizures." *Id*. [2] at ¶ 9. He was placed in the general population and did not receive any further medical screening or see any healthcare provider that night. *Id*.

Later that morning, at approximately 7:00 a.m., Officers May and Summerford found Holloway lying on the floor inside PT-5 (a zone area with other inmates/detainees), at which time Plaintiff advised the officers that he had had a seizure. [66-3] 14:2-15:9; [63-4] 61:16-62:10. There was an incident report created, but no code blue.[4] [63-4] 53:22-54-2. Officer May looked him over, saw no visible injuries and asked if he was okay, and Holloway said yes. [66-3] 14:20-25; [63-4] 62:16-18.[5] The officers placed Holloway in a wheelchair and transported him to booking and put him in a holding cell so that the officer could keep an eye on him until the nurse arrived. [66-3] 15:1-9. When Nurse Pendarvis arrived, Officer May told her what had occurred. [66-3] 15:10-12; [63-4] 64:8-12.[6] Shortly after arriving,[7] Pendarvis checked on Holloway at approximately 8:15 a.m. and noted in her medical chart that he showed no abnormalities and that Holloway stated "he has not taken seizure medication in 2 days" and "someone will bring meds to facility." [63-3] at p. 3. She did not refer him out to get checked by a doctor at that time. [63-4] 54:12-14.[8]

---

[3] The first two are seizure medications, and norco is a pain medication. [63-4] 38:10-17.
[4] Per the policies and procedures of the County, when there is a medical emergency, a code blue is called, and medical personnel go to the scene, assess the person and if they need to go out, they call an ambulance or take them to the hospital. [63-4] 57:11-20.
[5] Pendarvis appears to be reading from an Exhibit 3 to her deposition that has not been submitted into this record when she indicated that there were "no visible injuries." There has been no other evidence submitted to show that Holloway did indeed sustain any injuries at that time.
[6] Pendarvis states that the officers called and told her that they had moved Holloway and that he said he was having a seizure. In any event, she was aware that he stated he had had a seizure.
[7] Pendarvis testified she works 8:00 a.m. to 5:00 p.m. [63-4] 27:6-8.
[8] Defendants admit that Plaintiff told officers he was having seizures and was transported by wheelchair and placed in a holding cell on medical watch where Pendarvis examined him and determined he needed no further medical attention. [10] at ¶ 10.

At 10:15 a.m., Nurse Stogner was made aware that Holloway's medicines had arrived at the facility, which were carbamazepine, phenobarbital, and Vimpat. [63-3] at p. 4. This was the first time Nurse Pendarvis had ever seen Vimpat. [63-4] 72:16-18. When the medicine arrived there were 109 tablets of the carbamazepine (filled on 9/16/16); 56 tablets of the phenobarbital (filled on 9/16/16); and 8 tablets of the Vimpat (filled on 9/6/16). [63-3] at p. 4. These are all antiepileptic drugs. [63-4] 38:8-17. When the Vimpat was filled on 9/6/16, only 10 of 60 tablets were filled. [63-4] 42:20-22. These medicines had all been filled at a Walgreen's in Pass Christian, Mississippi. [63-3] at p. 4. These medicines were all administered for the first time at 10:15 a.m. on September 20, 2016. [63-4] 42:13-16. At this time, Nurse Stogner also reviewed the medicines with Holloway, and he indicated these were his current meds. [63-3] at p. 4. He was questioned regarding the Vimpat prescription being filled for only 10 tablets on 9/6/16 and stated, "I don't take that much." [63-3] at p. 5. The Nurses administered all of three of these medicines twice a day from September 20, 2016 through September 23, 2016. [63-4] 43:5-44:5.

On September 21, 2016, Nurse Pendarvis saw Holloway in the hallway presenting normally. [63-3] at p. 6. At that time Holloway indicated he would call his girlfriend, that she would get the medicine filled and bring it there. *Id*. The next day on September 22, 2015, at about 7:00 a.m., Holloway was moved from Holding Cell 2 to Lock Down #01, remaining on medical watch. [63-2] at p. 1. When a detainee is in a lock down cell, every 28 to 30 minutes the jailers are to check on him and make sure he is alive and breathing. [63-4] 30:7-32:6. About two hours later, at about 9:00 a.m., Plaintiff was moved from Lock Down #01 into the designated medical cell, which was Old Lockdown #13. [63-2] at p. 1; [63-4] 145:10-12; 148:2-17.

Later on the morning of September 22, 2016, at 9:58 a.m. the Nurses placed an order for 20 tablets of Vimpat with Shepherd's Pharmacy, whom the jail facility has a contract with. [63-

4

3] at p. 8. Around 10:09 a.m. Nurse Pendarvis visited Holloway and noted he was ambulating without difficulty, coherent, smiling and cooperative, and voiced no complaints of pain. [63-3] at p. 9. She checked his blood pressure, temperature, pulse, and respiration rate. *Id*. Holloway provided Nurse Pendarvis the contact number for the girlfriend, but there was no answer at that time. *Id*. Holloways stated that he would "contact [her] to bring meds." *Id*. At 2:00 p.m. the Nurses were advised that Shepherd's was out of stock of the Vimpat. [63-3] at p. 7; [63-3] at p. 10. Nurse Pendarvis's notes indicate, "Inmate to request girlfriend to fill meds and bring to facility." [63-3] at p. 10. The Nurses did not contact any other pharmacies or alert any doctor or the nurse practitioner.[9] [63-4] 45:10-18.

On Friday September 23, 2016, the Nurses obtained a release of information ("ROI") for Holloway's medical records and faxed it to Gulfport Memorial at 10:07 a.m. [63-3] at p. 12; [63-4] 48:3-16. The purpose of requesting the information was for the doctor to review when she came in to be familiar with the records. [63-4] 123:9-11; [63-5] 55:7-10. Holloway's records came in at 1:08 p.m. that same day. [63-4] 121:1-123:2. Neither of the Nurses reviewed the records prior to the time Holloway was found unresponsive on September 25, 2016. [63-4] 123:5-8; [63-5] 55:11-57:9.

The nurses' notes from the morning of September 23, 2016 indicate Holloway was smiling, and speaking coherently, no difficulty in moving, and asking, "Can I get out of here?" and stating, "I haven't had any seizures since I been in here."[10] [63-3] at p. 13. Nurse Pendarvis noted that she spoke with him about not filling his Vimpat prescription per the doctor's orders, and Holloway stated, "I can't afford it. That medicine cost too much." *Id*. When she instructed that the medication filled on September 6 should have been completed on September 10,

---

[9] The facility has a nurse practitioner that comes in every Tuesday. [63-4] 33:3-14.

5

Holloway stated that he did not take medication every day due to cost. *Id*. She advised him to follow up with the doctor to voice his concern about the cost of the medicine. *Id*. Finally, the notes indicate that Holloway states, "Are you gonna move me? I got my medicine in me now. I'm ready to get out of here, so I can talk to people." [63-3] at p. 14. He stated that he had surgery in January but I'm good. *Id*. Finally, Nurse Pendarvis notes: "ROI obtained and faxed to MD, Gulfport Memorial. Refer to NP."

The Nurses' notes from the evening of September 23, 2016 indicate that Holloway was moving without difficulty, breathing evenly and unlabored, and speaking coherently. [63-3] at p. 15. Holloway's meds were given at that time.[11] Holloway stated, "Nurse will you move me out of here. I'm good. I'm good. . . I haven't had any seizures, so can I get out of here?"[12] *Id*. Nurse Pendarvis instructed Holloway to take medications as directed by doctor, and Holloway responded, "I been doing good. I got two jobs." *Id*. He was smiling, cooperative, and talkative. *Id*. Nurse Pendarvis noted that she would consider his request to be moved. *Id*.

On the morning of September 24, 2016, Nurse Stogner visited Holloway during evening medicine distribution, and he asked to be placed "on zone."[13] [63-3] at p. 17. She notes that he stated, "I'm okay, I ain't had no seizures" and further notes that "inmate to see facility MD on Tuesday." *Id.* Having received his last dose of Vimpat on September 23rd, he did not receive any doses of Vimpat on September 24, 2016. On the night of September 24th, an inmate fell and hurt his leg, and the officers at the jail called Nurse Pendarvis to see about moving Holloway out of the medical watch cell to a lock down cell. [63-4] 133:13-134:9. She approved the request,

---

[10] At this time, Holloway was still in Old Lock Down #13, which is the designated medical watch cell.
[11] It is undisputed that Holloway received his last Vimpat pill on September 23, 2016 at approximately 5:00 p.m. [63-4] 44:6-8; [63-5] 52:10-53:2.
[12] The evening of September 23, Holloway was still in Old Lock Down #13.
[13] A zone has no designated cells, just an open area with beds and tables, etc. [63-4] 61:20-62:10.

and in the early morning hours of September 25, 2016,[14] Holloway was moved from the designated medical cell (Old Lock Down #13) to Lock Down #13.[15] [63-4] 134:10-13; 148:18-20; [63-2] at p. 1. In lockdown #13, he was treated the same as if he were in the designated medical holding cell. [63-4] 148:18-23; [63-5] 61:25-62:7; 82:24-83:4. Nurse Pendarvis felt she did not have to advise the jail officers to check on Holloway every 28-30 minutes because that is what they are required to do when someone is in a lockdown cell. [63-4] 135:13-136:2.

On September 25, 2016 during the morning medical pass at approximately 8:30 a.m., Holloway was found unresponsive in his cell. [63-3] at p. 18. At 8:36 a.m. a code blue was called and an ambulance summoned, which arrived at the jail at 8:46 a.m. *Id.* Nurse Stogner and Officer Young performed CPR until the paramedics arrived. *Id.* Holloway was transported to the hospital in the ambulance at 9:09 a.m. *Id.* Nurse Stogner contacted the hospital and informed the ER nurse of Holloway's medications. *Id.* Holloway remained in a vegetative state until he passed away on or about November 16, 2019. [70].

## II. ANALYSIS

### A. Legal Standard

The Nurses have invoked qualified immunity. Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *McClendon v. City of Columbia*, 305 F.3d 314, 322 (5th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The bifurcated test for qualified immunity is quite familiar: (1) whether the plaintiff has

---

[14] The cell assignment history indicates that the move occurred at 2:25 a.m. on 8/25/16. [63-2] a p. 1. However, Holloway may have been in Lock Down 13 by 11:50 p.m. on September 24, 2016. *See* [63-5] 82:24-84:5. That having been said, the exact time is not particularly relevant.

alleged a violation of a clearly established constitutional right; and, (2) if so, whether the defendant's conduct was objectively unreasonable in the light of the clearly established law at the time of the incident. *Hare v. City of Corinth, Miss.*, 135 F.3d 320, 325 (5th Cir. 1998).

A right is clearly established when its contours are " 'sufficiently clear that a reasonable official would understand that what he is doing violates that right.' " *Gates v. Texas Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 419 (5th Cir. 2008) (quoting *Wooley v. City of Baton Rouge*, 211 F.3d 913, 919 (5th Cir.2000)). If the plaintiff has alleged a violation of a clearly established right, the next step is to determine whether the official's conduct was objectively reasonable under the law at the time of the incident. *Michalik v. Hermann*, 422 F.3d 252, 258 (5th Cir. 2005) (citing *Sanchez v. Swyden*, 139 F.3d 464, 467 (5th Cir.1998)) (citations omitted)). This qualified immunity analysis alters the usual summary judgment burden of proof in that the plaintiff bears the burden of proving that a government official is not entitled to qualified immunity, i.e., that the defendants' actions were objectively unreasonable in light of law that was clearly established at the time of the action. *See, e.g., Poole v. Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012); *Bennett v. City of Grand Prairie,* 883 F.2d 400, 408 (5th Cir. 1989); *Montano v. Orange County,* No. 1:13-cv-611, 2015 WL 11110626 at *4 (E.D. Tex. Jan. 22, 2015) (citing *Gates,* 537 F.3d at 419).

### B. Discussion

In their motion for summary judgment, the Nurses argue that Plaintiff has failed to show that the Nurses violated a clearly established right or that they acted objectively unreasonable in their care of Holloway.

---

[15] There is "Old Lock Down 13" and "Lock Down 13"—two separate cells in different parts of the jail.

### 1. Holloway's Constitutional Right

"The constitutional rights of a pretrial detainee are found in the procedural and substantive due process guarantees of the Fourteenth Amendment." *Estate of Henson v. Wichita Cty., Tex.*, 795 F.3d 456, 462 (5th Cir. 2015) (citing *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 639 (5th Cir. 1996) (en banc)). In addressing the bifurcated test, it has long been established in the Fifth Circuit that pretrial detainees have a general due process right not to be denied, by deliberate indifference, adequate medical care for his serious medical needs. *Hare*, 135 F.3d at 326 (citing prior en banc decision *Hare*, 74 F.3d at 647-48). In this case, Plaintiff has consistently alleged that the Nurses' knew that Holloway was at serious risk of life threatening seizures and that the Nurses' actions, and inactions, constituted deliberate indifference to Holloway's serious medical needs. Therefore, pursuant to the long established precedent in the Fifth Circuit, Plaintiff has sufficiently alleged the violation of an established constitutional right.[16]

### 2. Objective Unreasonableness of Nurses' Actions

Next, because the deliberate indifference standard was clearly established as of September 2016, it is that standard to which the Court holds the Nurses in determining, objectively, the reasonableness of their conduct. *See Hare*, 135 F.3d at 327 (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). This determination focuses on the particulars of the

---

[16] Because qualified immunity is often raised at the pleadings stage, the test is only whether the Plaintiff has *alleged* the violation of a clearly established right, which he has done, not whether Plaintiff can establish an actual violation through the evidence—that is a summary judgment motion on the merits of the case. *Cf. Pearson v. Callahan*, 555 U.S. 223, 232-236 (2009) (discussing and holding that courts may address whether a plaintiff has alleged the violation of a constitutional right or whether the right was clearly established at the time of the alleged violation in any order). Thus, the Court finds the Nurses' arguments regarding this point are directed more toward the merits of the case and the ability to establish a violation, i.e., liability. With the instant motion, the Court is addressing only the issue of entitlement to a qualified immunity defense. Thus, the Court did not overlook the Nurses' initial argument; it just found it inappropriate as a ground for summary judgment. However, the Court did consider such argument for the purpose of determining the objective reasonableness of the Nurses' actions.

challenged conduct and/or of the factual setting in which it took place. *Pierce v. Smith*, 117 F.3d 866, 872 (5th Cir. 1997); *see also Freeman v. Gore*, 483 F.3d 404, 411 (5th Cir. 2007) (explaining that the court "applies an objective standard based on the viewpoint of a reasonable official in light of the information then available to the defendant and the law that was clearly established at the time of the defendant's actions.").

In determining whether the Nurse's actions were objectively unreasonable in light of this deliberate indifference standard, we look at what constitutes deliberate indifference. Deliberate indifference in the context of a failure to provide adequate medical care means the official knew that a detainee faced a substantial risk of serious harm and disregarded that risk by failing to take reasonable measures to abate it. *See Hare*, 74 F.3d at 649; *see also Estate of Henson v. Krajca*, 440 Fed. Appx. 341, 343 (5th Cir. 2011) (stating deliberate indifference is "shown when 'the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference'").

The Court must be mindful, however, that the subjective deliberate indifference standard establishes liability, which goes to the merits of the case, but we are not at the merits stage here. We are at the summary judgment stage to assess the applicability of a qualified immunity defense. Thus, while it is against this liability standard that the Court analyzes qualified immunity, it must not confuse the subjective standard on the merits with the objective standard of the reasonableness of the Nurses' actions, which is all that is to be addressed.[17] *See Thompson*

---

[17] The Fifth Circuit clarified these standards in the *Thompson* case. Nevertheless, the parties appear to be confusing the two standards at times in their briefing. As the Fifth Circuit has stated, "Obviously, the analysis for objective reasonableness is different from that for deliberate indifference (the subjective test for addressing the merits). Otherwise, a successful claim of qualified immunity in this context would require defendants to demonstrate that they prevail on the merits, thus rendering qualified immunity an empty doctrine." *Hare*, 135 F.3d at 328.

*v. Upshur County, TX*, 245 F.3d 447, 459-460 (5th Cir. 2001); *see also Hare*, 135 F.3d at 328 (citing *Mangieri v. Clifton*, 29 F.3d 1012, 1016 (5th Cir.1994)) ("[I]n evaluating a claim of qualified immunity, the district court is to make a determination of the objective reasonableness of the official's act as a matter of law.").

Again, for Plaintiff's claim to survive this prong of the qualified immunity test, the Court must find that the Nurses' alleged conduct was objectively unreasonable under the applicable standard for deliberate indifference at the time of their conduct. "Examples of behavior that does (and does not) constitute deliberate indifference are relevant in assessing the scope of clearly established law and, therefore, relevant in determining whether the defendant's actions were objectively reasonable." *Thompson*, 245 F.3d at 459-460. Courts have held that a plaintiff can show deliberate indifference with evidence that a prison official "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Galvan v. Calhoun Cty.*, 719 Fed. Appx. 372, 374 (5th Cir. 2018) (quoting *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985)).

The Nurses argue that the law was not clearly established regarding any of their actions such that it would put the Nurses on notice that their actions were unconstitutional. [64] at pp. 18-19. They rely on case law wherein courts found that missing a few doses of medication, without more, does *not* constitute deliberate indifference. [64] at p. 19. Plaintiff argues such cases are inopposite because those cases deal with non-life sustaining medications. [67] at pp. 14-15

While the exact fact pattern of the case under review need not be found in prior case law, as the Supreme Court explained,

[the] contours [of the right] "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. *This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful . . .* but it is to say that in the light of pre-existing law the unlawfulness must be apparent."

*Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (emphasis added) (internal citation omitted) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

### a. Plaintiff's allegations

Based on the pleadings,[18] Plaintiff claims that the Nurses violated his constitutional right to adequate medical care by the following acts or omissions:

1) not transporting Holloway to a hospital after the first seizure;

2) failing to check with any other pharmacy to fill the Vimpat prescription;

3) not transporting Holloway to a hospital when the Vimpat pills ran out so that he could be properly monitored;

4) moving Holloway out of medical watch and into general population when not taking prescribed seizure medication and likely to have more seizures; and

5) failing to provide Holloway with the known and medically necessary medicine and care required to sustain his life.

[2] at ¶¶ 10, 13, 14, 15, 42. Viewing the facts in the light most favorable to Plaintiff, it is true that Holloway was never transferred to a hospital during his detention prior to September 25, 2016 when he was found unresponsive—not after the first seizure and not after running out of Vimpat. It is true that the Nurses never checked with another pharmacy to obtain additional

---

[18] There are no further assertions, through discovery responses or other means, in the record that would change the allegations/claims of the constitutional violations at issue. In his brief, Plaintiff also claims that the nurses "failed to review Holloway's medical records even though they had them." Because this was not an act or omission that was pled, and Plaintiff never makes clear what the records contained that would have put the nurses on notice of a substantial risk of serious harm to Plaintiff, the Court has not factored in this act or omission into its analysis.

Vimpat. As for the fourth allegation and being moved into the general population, the testimony was that Holloway was moved from the designated medical watch cell Old Lock Down #13 into Lock Down #13 but was to remain on medical watch.[19] Plaintiff has not created a genuine issue of material fact to rebut that testimony.[20] And as to the fifth allegation, the Court finds it to be a legal conclusion and not factually based such that it would allow the Court to analyze a particular action as being reasonable or unreasonable. Thus, we examine the Nurses' failure to obtain more Vimpat and failure to transport Holloway to a hospital setting at any time during his detention.

### b. Assessment of Actions

The Court recognizes and empathizes with Plaintiff that the outcome for Louis Holloway was no less than tragic. Notwithstanding, in addressing the Nurses' immunity for their actions, Plaintiff fails to establish that the contours of the right were clearly established to the point that the Nurses would have been on notice that their actions were objectively unreasonable. Plaintiff's initial argument seems to address the merits of the case—arguing that the Nurses were subjectively aware that ceasing seizure medication could cause a seizure.[21] However, on the issue of objective unreasonableness, Plaintiff argues that "Defendants fail to cite any cases wherein a nurse was given qualified immunity when they failed to give a patient medicine for a serious medical condition." [67] at 15. However, it is Plaintiff's burden on summary judgment to show that in light of clearly established law, the Nurses' actions were objectively unreasonable. *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008).

---

[19] *See supra* pp. 6-7.
[20] Thus, the Court did not analyze such action because the alleged violation does not appear to have occurred at all.
[21] An official must have "subjective knowledge of 'a substantial risk of serious harm' to the detainee and responded to that risk with deliberate indifference." *Estate of Henson v. Wichita Cty., TX*, 795 F.3d 456, 462 (5th Cir. 2015).

13

In support of its claims, Plaintiff contends that Nurses failed to follow clearly established laws, rules and regulations of the MWCRCF, the state of Mississippi and the United States, which strictly prohibit the Defendants from withholding known needed medication from those in their care. However, Plaintiff fails to cite to any particular policy or procedure of MWCRCF that created an affirmative duty on the part of the Nurse's that was ignored. As for Plaintiff's attempt to show clearly established law, that will be addressed *infra* when discussing the cited case law.

Plaintiff also argues that Nurses acknowledge that the "standard of care" is to follow physician's orders with regard to dispensing medicine. [67] at p. 4. Plaintiff argues that Nurses knew Holloway from previous incarcerations and were aware that seizures are a serious medical condition, which could be triggered by numerous things including cessation of medicine. [63-4] at 26. Even accepting all of Plaintiff's cited evidence as true, the issue is not whether the Nurses made "poor clinical decisions,"[22] but whether their actions were objectively unreasonable in light of clearly established law.

As the Nurses point out in their reply, this is not a standard negligence claim. *See Gibbs v. Grimmette*, 254 F.3d 545, 549 (5th Cir. 2001) ("Deliberate indifference is more than mere negligence in failing to supply medical treatment."); *see also Thompson*, 245 F.3d at 459 (explaining that "deliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm."). In addition, "[d]eliberate indifference must be viewed from [the defendant's] perspective at the time in question, not with hindsight's perfect vision." *Bland v. Terrebonne Par. Criminal Justice Complex*, No. CIV.A. 09-

---

[22] [67] at p. 12 (citing to expert's conclusions). The expert evidence is not particularly helpful to the Court in assessing the reasonableness of the Nurses' action under the particular circumstances of this case.

4407, 2009 WL 3486449, at *6 (E.D. La. Oct. 23, 2009) (quoting *Jackson v. Everett,* 140 F.3d 1149, 1152 (8th Cir. 1998)).

The case law cited by Plaintiff to establish the claims is distinguishable. Plaintiff cites to *Lee v. Jackson County*, wherein the Court denied a nurse's motion for summary judgment on the merits, not on qualified immunity. No. 1:13-cv-441, 2017 WL 53952, *1 (S.D. Miss. Jan. 3, 2017). In *Lee*, an inmate made multiple requests to be placed on his seizure medication prior to his death on February 24, 2013. *Id.* at *2-4. His intake form had not listed any specific medications that he took, what medical provider had prescribed such medications, or what pharmacy was used. *Id.* at *2. Lee had been incarcerated on previous occasions, and his past medical records would have revealed that he was taking three 100mg Dilantin per day, but the nurse did not remember reviewing the records. *Id.* Staff contacted the inmate's sister, but no one was willing to bring his medication to the facility. *Id.*

In Lee's requests (on January 6, January 8, and February 22) he asked to see a doctor, advised his condition was life threatening, on February 22 complained of seizures, and told of symptoms like cool sweats and low blood pressure.[23] *Lee*, 2017 WL 53952, at *2, 3. For him to receive his current medications, he had to fill out an ROI, but such was not done until February 22. *Id.* at *4. The court found that there was a genuine issue of material fact as to whether the nurse had subjective knowledge of a substantial risk of serious harm to Mr. Lee and responded with deliberate indifference. *Id.* at *11.

In this case, the Nurses never ignored any complaints from Holloway because he did not have any. Unlike the nurse in the *Lee* case, these Nurses saw Holloway each day he was in the

---

[23] It was the protocol of the jail that the nurse would only have face-to-face contact with an inmate on Tuesdays, with the doctor, unless it was an emergency.

facility. He presented well each time the Nurses saw him. He indicated he was feeling good and wanted to be moved out of medical watch, which was never granted. Even in his last move to Lock Down #13, he was to remain on medical watch and checked on every 28-30 minutes.[24] He never showed any signs of acute distress during his detention and never indicated he felt any. As for his first seizure, assuming, for summary judgment purposes, that he indeed had one,[25] Nurse Pendarvis saw him just over an hour later. Holloway did not mention the seizure, and he seemed to be functioning normally. According to Nurse Pendarvis's notes, Holloway told her he had not taken any seizure medication in two (2) days, which could have explained having a seizure on the morning of September 20, 2016. Not being in any distress, there was no objective need to transport Holloway to the hospital at that time.

By 10:00 a.m. that same morning, the Nurses had Holloway's medications—three of which were anti-seizure medications. In *Lee*, there was only one seizure medication, Dilantin, and the nurse essentially made no effort to obtain it. The medications for Holloway were distributed as directed until the Vimpat ran out on Friday evening, September 23rd. The nurses addressed the Vimpat with Holloway more than once. They ordered more, but the pharmacy was out, and Holloway kept assuring the nurses his girlfriend would get the medicine. Even though there was none for distribution on Sunday, there were two other seizure medications that Holloway was prescribed and taking. The Nurses knew that Holloway had not taken the Vimpat

---

[24] From reading Stogners's deposition, there appears to be documentation showing that Holloway was not watched every 28-30 minutes, but these acts were not within the Nurses' control due to their shift ending at 5:00 p.m. [63-5] 83:12-86:6.

[25] Plaintiff asks for an adverse inference to be drawn due to the lack of surveillance video regarding Holloway's first seizure because Marion County should have maintained the videos. "As a general rule, in this circuit, the severe sanctions of granting default judgment, striking pleadings, or giving adverse inference instructions may not be imposed unless there is evidence of 'bad faith.'" *Rimkus Consulting Grp., Inc. v. Cammarata*, 688 F. Supp. 2d 598, 614 (S.D. Tex. 2010) (citations omitted). Nowhere is it implied or argued that the Nurses were responsible for maintaining any video surveillance. Plaintiff fails to show that the Nurses had control over the evidence or had any obligation to preserve it, or showed any bad faith relating to the video. For these reasons, the request is denied.

on a regular basis because not only had he told them, but also he filled only 10 pills on September 6 and appeared to have taken only 2 Vimpat in the past thirteen days because his family brought only 8 pills to the facility. Thus, under the circumstances presented, this case is distinct from the *Lee* case, and the Court finds that it was not objectively unreasonable for the Nurses not to send Holloway to the hospital after the first seizure or after the Vimpat ran out.

As for not doing whatever was necessary to obtain more Vimpat, again, there was no indication that stopping the Vimpat, when taking two other seizure medications, would cause any serious risk to Holloway's health. He never indicated that when he did not take the Vimpat due to cost, but took only the other two, that he suffered from seizures. Holloway stated he had not taken *any* seizure medications for two days upon his arrival. Thus, there was no indication that it was imperative to have the third seizure mediation in addition to the two that he was taking the entire time of his detention. Deliberate indifference is not the equivalent of failing to provide the utmost preventative measures. The Nurses acted based on the subjective knowledge they had, and there has been no case law presented showing that their actions at that time were objectively unreasonable.

Plaintiff also cites to *Lawson v. Dallas County*, 286 F.3d 257, 263 (5th Cir. 2002), for the proposition that deliberate indifference was found when nurses did not follow specific mandatory orders and doctor's instructions despite their knowledge of the seriousness of an inmates condition. [67] at pp. 16-17. Again, this case is distinguishable. In *Lawson*, the inmate was a paraplegic whose was being treated by an outside physician at a hospital when the patient was arrested for a parole violation. 286 F.3d at 260. Paraplegics are a risk of developing decubitus ulcers caused by unrelieved pressure on the body, which can be life threatening. *Id.* The inmate's

physician called the jail to express his concern that the jail could not provide the critical care needed by his patient. *Id.* On his transfer form, the physician provided specific instructions regarding exercises and turning the patient at certain intervals, etc. *Id.* The instructions were illegible, yet the intake nurse did not contact the hospital or physician to clarify the orders. *Id.* The inmate subsequently fell off the bed, and the officer on duty refused to help. Within two months, the inmate had developed Stage II decubitus ulcers, and the jail doctor ordered specific dressing changes three times a day, but the nurses did not comply because it was jail policy to only change dressings twice a day. 286 F3d at 260. This continued on until he had developed Stage III and IV ulcers, but still the doctor's orders went unheeded because they contravened jail policy. *Id.* at 261.

Here, there were not specific doctor's orders and a written expression of concern. There was a doctor's prescription for Vimpat that indicated it is to be taken twice a day. There were two other seizure medications prescribed by the same doctor. Holloway was not taking the Vimpat regularly, which the Nurses were made aware of. He had been in the jail on numerous occasions and the Nurses had a rapport with him. He never voiced concern over the lack of taking Vimpat and never voiced concern that he would be at risk if he did not have that one particular medicine. Plaintiff's characterize these lack of complaints as blaming the victim, but the Court disagress, as it shows the Nurses' knowledge and state of mind at the time of Holloway's detention.

Plaintiff also relies on two Seventh Circuit cases, *Hudson v. McHugh*, 148 F.3d 859 (7th Cir. 1998), and *Antonelli v. Sheahan*, 81 F.3d 1422 (7th Cir. 1996). Both of these cases are also readily distinguishable. In *Hudson*, an inmate went eleven (11) days without Dilantin, his seizure

18

medication. 148 F.3d at 861. During his intake, the inmate told the jail officers that he was epileptic and needed his Dilantin on a daily basis. *Id*. at 861. Over the next few days, the inmate continued to request his Dilantin, filling out several medical request forms, but no medicine was given to him. That is not the case here. The Nurses did not ignore requests, and the Court finds with the other two epilepsy medications being given regularly, and Holloway's consistent outward stability, the Nurses had no immediate concern of any risk of serious harm to Holloway prior to his being found unconscious.

As for the *Antonelli* case, it made no determination of deliberate indifference but only involved the sufficiency of a *pro se* plaintiff's pleading of a conditions of confinement claim on a motion to dismiss by defendants. 81 F.3d at 1426. The court found that the plaintiff had stated a claim in that his "pleas" for psychological treatment were "ignored," and that he had also stated a claim in alleging that he has been deprived of medication that he alleged he needed. *Id.* at 1432. Antonelli is not only procedurally distinguishable, but again, it involved requests that went unheeded. Such a case from another circuit would hardly put these Nurses on notice that their actions deprived Holloway of a clearly established constitutional right.

Plaintiff argues that the Nurses knew Holloway had epilepsy, they knew he did not have his medicine and they knew he wasn't getting it—and with knowledge of these basic facts, drawing the inference of a serious medical need is a question of fact. [67] at p. 17. Again, this goes to the merits of the case. This Court must determine whether the actions were objectively unreasonable under the circumstances, and in this case, the Court ordered the parties to address in limited discovery, whether the Nurses were aware of Holloway's condition and the effect of Louis not receiving his medication. Now, through this limited discovery and the testimony

obtained, we have more than just the fact the Nurses were aware that Holloway suffered from epilepsy. At the MJOP stage, the Complaint did not give the Court the benefit of the Nurses' notes now submitted into evidence on summary judgment nor their deposition testimony. Holloway presented quite normally during every visit from the Nurses, who checked on him every day. Holloway was on medical watch for his entire detention, except for brief initial period. He was not taking his Vimpat regularly and showed no concern over not taking it. He was on two other seizure medications, which he was given regularly. He was to be seen by the nurse practitioner on that Tuesday, and showed no signs of needing emergency medical attention before then. These are all undisputed facts, just as much as the fact that Holloway had been diagnosed with epilepsy, the Nurses knew it, and did not transport him to the hospital or obtain more Vimpat.

### III. CONCLUSION

Based on the foregoing, the Court finds that the undisputed facts do not constitute objectively unreasonable conduct when applied against the deliberate indifference standard. Therefore, it is hereby ORDERED that the Motion for Summary Judgment Based on Qualified Immunity [63] filed by Defendants Laura Stogner and Sherry Pendarvis is **GRANTED**. All federal claims against the Nurses are dismissed with prejudice.

SO ORDERED AND ADJUDGED this 25th day of March 2020.

/s/ Keith Starrett
KEITH STARRETT
UNITED STATES DISTRICT JUDGE